# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

MELANIE (CARMELO) MANGIONE,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

Case No.:

## COMPLAINT

COMES NOW Plaintiff Melanie (Carmelo) Mangione ("Ms. Mangione"), by and through her attorneys, and files this Complaint for Damages against Defendant United States of America ("United States"). Pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 *et seq.*, Plaintiff seeks damages for injuries she suffered as a result of the wrongful acts of Defendant's employees, as follows.

## NATURE OF ACTION

1. This is an action for personal injury damages based on use of restraints in violation of 28 C.F.R. §552.22, carried out by correctional officers and other staff at United States Penitentiary Coleman II ("Coleman II").

2. 28 C.F.R. §552.22 provides guidelines governing the use of force and application of restraints. In particular: "Where the immediate use of restraints is indicated, staff may temporarily apply such restraints to an inmate to prevent that inmate from hurting self, staff, or others, and/or to prevent serious property damage."

On two separate occasions, in violation of 28 C.F.R. §552.22, Coleman II staff applied restraints to Ms. Mangione for at least eight hours where Ms. Mangione was not documented to be a threat to harm herself, Coleman II staff or others. Likewise, at no point during these incidents was it documented that Ms. Mangione created a serious risk of property damage. The unlawful application of restraints by Coleman II staff caused Ms. Mangione permanent physical harm.

## JURISDICTION AND VENUE

3. This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1). Ms. Mangione's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

4. This Court has personal jurisdiction because the alleged incidents occurred within the State of Florida.

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Ms. Mangione's claims occurred within the boundaries of this District and Division, in the County of Sumter.

6. Ms. Mangione filed an Administrative Claim (Form 95) on June 7, 2024, with the Federal Bureau of Prison's Southeast Regional Office. The Federal Bureau of Prisons issued a denial of Ms. Mangione's claim dated December 6, 2024, and post-marked December 13, 2024. Consequently, Ms. Mangione has exhausted all

obligatory administrative remedies, and the FTCA claim is legally ripened for presentation in this civil action.

## PARTIES

### A. Plaintiff Ms. Mangione

7. Ms. Mangione is a 58-year-old transgender woman, who at all times relevant to this Complaint was a resident at Coleman II.

8. Ms. Mangione arrived at Coleman II in February of 2022 and remained there until February of 2023.

9. Ms. Mangione was transferred to USP Terre Haute in February of 2023, and is currently a resident at that facility.

### B. Defendant

10. The United States created and oversees the Federal Bureau of Prisons ("BOP"), a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities.

11. The United States employs all BOP correctional officers, guards, and staff named in this Complaint. At all relevant times herein, the individuals mentioned below were acting as agents of the United States.

## FACTS

12. Coleman II is a federal penitentiary located in Coleman, Florida, a city in Sumter County, Florida.

13. Coleman II is a high-security facility that houses approximately 1,077 adult males[1] and is part of the Coleman Federal Correctional Complex.

14. Coleman II has one Special Housing Unit ("SHU"). The purported purpose of the SHU is to (1) house residents in disciplinary segregation as a result of a formal disciplinary findings; (2) house residents on administrative detention pending transfer or investigation of a disciplinary infraction; and (3) house residents in protective custody.

15. In reality, the SHU, which is routinely kept at full capacity by Coleman II's administration, has an additional unauthorized purpose as a venue for extreme abuse and retaliation against residents by prison staff.

16. Coleman II staff have been heard by Ms. Mangione and other residents referring to the SHU as their "torture chamber."

17. A "black box" restraint is a hard plastic box placed over the locks of the handcuffs between the resident's hands that further restricts movement.

A. **Relevant Incidents**

18. In or around early June 2022, Ms. Mangione was sexually harassed and assaulted by another resident in Coleman II. On June 7, 2022, Ms. Mangione requested protective custody and filed a complaint under the Prison Rape Elimination Act. As a consequence of Ms. Mangione's request for protective custody, she was transferred to the SHU.

---

[1] *See* Federal Bureau of Prisons: USP Coleman II, https://www.bop.gov/locations/institutions/clp/;jsessionid=FAEA2A6BD3BB61043559F5B4E98562C9 (last visited June 4, 2025).

19. When Ms. Mangione arrived at the SHU in early June 2022, she was placed in a cell without a mattress or hygiene materials. For approximately two weeks, Ms. Mangione requested from the SHU staff she be given a mattress in her cell and hygiene materials. To address the issue, she began also requesting BP-8 grievance forms, and was not provided any.

20. During Ms. Mangione's time in the SHU, the staff frequently made derogatory, threatening comments to her, including calling her a "fa\*\*ot" and a "ni\*\*er lover," and telling her "you're not worth the color of your skin" and "we got your fa\*\*ot ass now." They also told her that she "couldn't handle" the sexual assault she had reported earlier in June. In response to her requests for a mattress, hygiene materials, and grievance forms, the SHU staff often said, "I'll give you something to complain about."

21. On or around June 21, 2022, Coleman II staff expressed their displeasure with Ms. Mangione's requests by leaving her "hog-tied" in restraints in her cell overnight, approximately eight hours. Within an hour of again making the request regarding a mattress, hygiene materials, and grievance forms, shortly after dinner, staff came to her cell and instructed her to put her hands through the tray slot to be handcuffed. She complied, and was handcuffed behind her back. Multiple officers entered her cell, sprayed her in the face with oleoresin capsicum spray (pepper spray), and slammed her to the floor. The officers placed restraints on her feet, and a black box on her hands in back. They then pulled her feet behind her to connect those restraints to the black box with a chain, leaving her in a "hog-tied" position. Ms.

Mangione was left in those restraints for the duration of one shift, which is approximately eight hours.

22. While in the restraints, Ms. Mangione was not able to eat, drink water, use the restroom, or wash the pepper spray off herself. Her shoulders and body were in excruciating pain: first they ached, then they went numb, and then her back, shoulders, and body were wracked with sharp stabbing pains. She also suffered severe pain in her stomach and abdomen because of a medical condition that requires her to use a catheter to urinate. While restrained, she had no choice but to urinate on herself without the catheter, causing her to bleed profusely. She was also forced to defecate on herself at some point, and remained on the floor covered in blood and waste until she was discovered by the morning staff.

23. Coleman II staff repeatedly kicked Ms. Mangione while she was restrained on the floor, including returning during the night and entering her cell to kick her again. They also prevented her from sleeping by leaving the lights on in her cell all night, kicking her cell door during every 15 minute round, and opening the tray slot to throw soap at her.

24. The use of restraints on Ms. Mangione on or around June 21, 2022 was not warranted. Ms. Mangione was not threatening harm to herself, other inmates or Coleman II staff. The reason she was in a cell in the SHU by herself was because of her request for protective custody due to alerting Coleman II staff of having been sexually harassed and assaulted by another resident in Coleman II. Likewise, at no point was Ms. Mangione creating a serious risk of property damage.

25. On or around December 2022, Coleman II staff again unnecessarily placed Ms. Mangione in restraints for approximately eight hours. Ms. Mangione asked the staff about her cellmate's status after they were removed from the cell, and the staff threatened her to stay quiet. Although she was already voluntarily handcuffed in back, multiple Coleman II staff entered her cell, and slammed her forward to the ground. The officers put a black box on her hands in back and a waist chain around her midsection, and again pulled her ankles up to her hands and cuffed them to the black box. She stayed that way on the floor of the cell until breakfast the next morning, approximately eight hours. The form of restraints used by Coleman II staff on this occasion were the same or similar to the restraints applied to Ms. Mangione on or around June 21, 2022.

26. Again, Ms. Mangione received no food, water, or access to a toilet or catheter while in restraints, causing her to urinate, bleed, and defecate on herself.

27. The use of restraints on these two occasions caused Ms. Mangione permanent physical harm. She has scars on both of her wrists. She also experiences numbness and tingling in her hands, and sometimes unexpectedly loses her grip on items she is holding. She also experiences hand cramping, muscle spasms in her arms and legs, and other symptoms associated with damages caused by the unlawful use of restraints.

28. Ms. Mangione was not provided meaningful medical treatment for her injuries at Coleman II. But upon being transferred to USP Terre Haute in February

2023, Ms. Mangione received a hand brace and physical therapy for the injuries she sustained as a result of the unlawful use of restraints at Coleman II.

### B. BOP Guidelines on Use of Force

29. The injuries sustained by Ms. Mangione arose from staff practices that are explicitly prohibited under the polices and regulations that govern staff conduct at Coleman II.

30. The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation have failed.[2] When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of residents, to prevent serious property damage, and to ensure institutional security and good order.[3]

31. Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident: (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[4]

32. Under no circumstances may physical restraints be employed to punish residents.[5]

---

[2] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[3] *Id* ¶ 6(c).
[4] *Id* ¶ 1.
[5] *Id* ¶ 6(h)(1).

33. BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[6] If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[7] Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible.[8]

34. As soon as an officer determines the resident has regained physical control and is no longer a threat to herself, other residents, or property, her restraints must be removed.[9] Staff members violate BOP policy if they fail to document each incident involving restraints, keep residents restrained longer than necessary, or if they restrain residents to punish or discipline them.[10]

35. Under BOP policy, all incidents involving the use of force and application of restraints must be carefully documented, then "reported and investigated to protect staff from unfounded allegations and eliminate the unwarranted use of force."[11] In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services

---

[6] *Id* ¶ 6(d).
[7] *Id* ¶ 9.
[8] *Id* ¶ 10.
[9] *Id* ¶ 5.
[10] *Id* ¶ 6(b).
[11] *Id* ¶ 6(j).

Administrator; Regional Director; and the Regional Correctional Administrator.[12] These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process designed to protect residents from the unauthorized use of force by prison staff.

36. The use of restraints against Ms. Mangione on or around June 21, 2022 was not warranted. Ms. Mangione was in the SHU because of her request for protective custody, not any behavioral or disciplinary reason. She was not threatening harm to herself. She was also not threatening to harm other residents or Coleman II staff, or to cause serious damage to property. The only apparent reason for the application of restraints to Ms. Mangione on or around June 21, 2022, was her repeated requests that she be given a mattress, hygiene materials, and grievance forms.

37. Similarly, at the time Coleman II staff applied restraints to Ms. Mangione on or around December 2022, the use of restraints was not warranted. Ms. Mangione was not threatening harm to herself, to other residents, or to Coleman II staff, nor was there any risk of serious property damage caused by Ms. Mangione. Instead, Ms. Mangione was put in restraints overnight for approximately eight hours – again being deprived of food, water, and access to a toilet and catheter – for inquiring about the status of her cellmate. This plainly violates BOP policy.

---

[12] *Id* ¶ 14(a)(1)–(5).

38. These incidents also violate BOP's policy explicitly prohibiting the use of restraints as punishment. Each torturous restraint incident occurred after Ms. Mangione raised issues to Coleman II staff or indicated her intention to file formal grievances. Coleman II staff also responded to Ms. Mangione's concerns by unlawfully spraying her with oleoresin capsicum spray, a use of force.[13] The fact that Coleman II staff verbally taunted Ms. Mangione with homophobic and racial slurs, kicked her, and prevented her from sleeping while in restraints, suggests that Coleman II staff placed her in restraints to punish her for raising concerns about the staff's treatment of her.

C. **Defendant's Responsibility of BOP Officers**

39. The United States is the appropriate defendant of Ms. Mangione's claims under the FTCA. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

40. At all times relevant hereto, the United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters, including at Coleman II, and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel.

---

[13] *Program Statement 5576.04 on Oleoresin Capsicum (OC) Spray*, Federal Bureau of Prisons (Feb. 6, 2017), https://www.bop.gov/policy/progstat/5576_004.pdf.

41. In addition, at all relevant times, the United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel comply with the Constitution and laws of the United States.

42. At all relevant times hereto, the Coleman II staff involved in these alleged incidents were correctional officers and/or employees of BOP and the United States. In their capacity as agents, servants, and employees of the United States, and within the course and scope of their employment as such, Coleman II staff was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at Coleman II, including Ms. Mangione.

## CAUSES OF ACTION

### COUNT ONE

*Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*

43. Ms. Mangione incorporates by reference as though fully stated herein, the allegations set forth in Paragraphs 1-42 above.

44. Ms. Mangione was unlawfully restrained by Coleman II staff, leaving her with severe physical and emotional injuries, including but not limited to permanent damage as detailed above.

45. The FTCA permits private parties to sue the United States in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, where the conduct at issue is premised on the acts or omissions of investigative or law

enforcement officers of the United States. 28 U.S.C. § 2680(h); *see also Millbrook v. United States*, 569 U.S. 50, 133 S. Ct. 1441, 185 L. Ed. 2d 531 (2013).

46. Under Florida law, assault is established by: (1) an intentional, unlawful threat by word or act to do violence to the person of another; (2) with an apparent ability to do so; (3) and doing some act which creates a well-founded fear of such violence being done. *Cannon v. Thomas ex rel. Jewett*, 133 So. 3d 634, 639 (Fla. 1st DCA 2014) (citing *H.W. v. State*, 79 So. 3d 143, 144-45 (Fla. 3d DCA 2012)). The required intent is the intent to do the act, not the intent to do violence to the victim. *Geovera Specialty Ins. Co. v. Hutchins*, 831 F. Supp. 2d 1306 (M.D. Fla. 2011), aff'd, 504 F. App'x 851 (11th Cir. 2013). For civil claims of assault under Florida law, the intent element does not necessarily involve the subjective intent to do harm. *Id.* at 1312 (citing *Spivey v. Battaglia*, 258 So.2d 815 (Fla. 1972)). Battery requires (1) actually and intentionally touching or striking another person against the will of the other; or (2) intentionally causing bodily harm to another person. Fla. Stat. § 784.03. Battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent. *Quilling v. Price*, 894 So. 2d 1061 (Fla. 5th DCA 2005) (citing *Paul v. Holbrook*, 696 So.2d 1311 (Fla. 5th DCA 1997)).

47. Each incident of assault and battery against Ms. Mangione occurred while she was in a vulnerable position and restrained and caused severe and lasting injuries to her body.

13

48.     During the tortious conduct committed by Coleman II staff against Ms. Mangione, each of these acted within the scope of their employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to the United States.

49.     The use of restraints by Coleman II staff as alleged above was malicious, intentional, and amounted to extreme and outrageous conduct. As a proximate result of such conduct, Ms. Mangione has suffered various bodily injuries, as well as psychological trauma, emotional distress, depression, and pain and suffering for which the United States is liable.

## COUNT TWO

*Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. §§ 1346(b), 2671-80 (1946)*

50.     Ms. Mangione incorporates by reference as though fully stated herein, the allegations set forth in Paragraphs 1-42 above.

51.     The FTCA permits private parties to sue the United States in a federal court for torts, including negligence, committed by persons acting on behalf of the United States. 28 U.S.C. § 2680(h); *see also Millbrook v. United States*, 569 U.S. 50, 133 S. Ct. 1441, 185 L. Ed. 2d 531 (2013).

52.     Under Florida law a negligence claim is established by: (1) the existence of a duty recognized by law requiring the defendant to conform to a certain standard of conduct for the protection of others including the Plaintiff; (2) a failure on the part of the defendant to perform that duty; and (3) an injury or damage to the Plaintiff

proximately caused by such failure. *Kenz v. Miami-Dade Cnty.*, 116 So. 3d 461 (Fla. 3d DCA 2013).

53.　　Coleman II staff, in the exercise of reasonable care, and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States, had a duty to keep Ms. Mangione safe, and breached that duty by unlawfully applying restraints to Ms. Mangione on two separate occasions. These officers knew, or should have known, that their failure to uphold this duty placed Ms. Mangione at an unreasonable risk of physical and mental injury.

54.　　Coleman II staff, in their capacity as and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States, breached their duties by using gratuitous force (including application of restraints) against Ms. Mangione, and failing to intervene regarding the use of restraints and further abuse. Coleman II staff acted in violation of BOP policy, and did so deliberately and carelessly, without proper regard to the risk of harm to Ms. Mangione.

55.　　As a direct and proximate result of the negligence and carelessness of the Coleman II staff, Ms. Mangione has suffered physical injuries, psychological trauma, emotional distress, depression, and pain and suffering. As a direct and proximate result of these acts or omissions, Ms. Mangione has suffered injuries for which she seeks compensatory and actual damages against the United States.

## COUNT THREE

*False Imprisonment Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*

56. Ms. Mangione incorporates by reference as though fully stated herein, the allegations set forth in Paragraphs 1-42 above.

57. Coleman II staff, acting within the course and scope of their employment with the BOP, under color of federal law, and in violation of 29 U.S.C. § 2680 falsely imprisoned and deprived Ms. Mangione of her liberty and freedom against her will and consent, without legal authority and necessity, and for the sole purpose of engaging in abuse and harassment.

58. Under Florida law, false imprisonment is established when the Plaintiff is imprisoned contrary to her will. *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. 4th DCA 2015). The core of this action is the unlawful detention of the Plaintiff and the deprivation of her liberty.

59. To state a cause of action for false imprisonment, the plaintiff must establish four elements: "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." *Montejo v. Martin Mem'l Med. Ctr., Inc.*, 935 So.2d 1266, 1268 (Fla. 4th DCA 2006); *Mathis v. Coats*, 24 So.3d 1284, 1289–90 (Fla. 2d DCA 2010).

60. Coleman II staff falsely imprisoned Ms. Mangione by placing her in restraints without cause, against BOP policy and procedure, and against her will.

16

61. As a result of falsely imprisoning Ms. Mangione, Coleman II staff caused damage to Ms. Mangione including physical injuries, psychological trauma, emotional distress, depression, and pain and suffering for which the United States is liable under the FTCA in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment for damages, including any costs and any interest that is recoverable under applicable law, and any such further legal and equitable relief this Honorable Court may deem just and proper against Defendant.

Date: June 5, 2025

Respectfully submitted,

/s/ *J. Daniel Gardner*
J. Daniel Gardner
Florida Bar No. 58639
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 S. Biscayne Boulevard
Miami, Florida  33131
Telephone:   (305) 358-5171
Facsimile:   (305) 358-7470
jgardner@shb.com